THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* FÉLIX DÍAZ ALICEA, Defendant and Appellant.

No. CR-64-42.        Decided February 19, 1965.

*Elí B. Arroyo* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Rodolfo Cruz Contreras, Assistant Solicitor General,* for The People.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

Appellant was charged with the crime of murder consisting in having attacked Nin Flores Coriano with a machete, inflicting several wounds as a result of which he died. A jury found him guilty of murder in the second degree and he was sentenced to serve from 15 to 25 years' imprisonment in the penitentiary.

The only error assigned in this appeal challenges the propriety of certain instructions transmitted to the jury. For a brief discussion of this error, it is first necessary to sum up the pertinent evidence.

The prosecution evidence consisted of the testimony of Bertila Vázquez Rivera and Agapito Coriano, mother and father respectively of the victim, Nin Flores Coriano, and of that of the police officer who investigated the facts and identified a photograph which was admitted in evidence. By stipulation, the report of the victim's autopsy was also admitted.

The testimony of Bertila Vázquez was summed up by the court as follows:

". . . That lady, Bertila Vázquez, testified that she is the mother of the victim, Nin Flores Coriano, and that on the day of the occurrence, October 17, 1960, her son Nin, the victim,

got up around half past nine and asked her the whereabouts of his father, Don Agapito. The mother answered that he was picking coffee, and he decided to go and help him. The mother, the witness, said that she started making coffee to send to Don Agapito, her husband and also the father of the victim, Nin Flores Coriano, in order that Nin would take it to his father; but when she finished making the coffee Nin had already left, and then she, the witness, as on prior occasions, decided to take the coffee herself to the place where Don Agapito was picking coffee on their farm. She testified that from the house to the place where they picked coffee there were more less 30 days [*sic*], which was the size of the farm. In order to help his father, as he had told her, he carried only a basket, and that she saw him leaving. While he walked he kept turning the basket around. The lady testified further and said that that road is winding, full of underbrush, hardly used by people. That she left on foot. Her son walked ahead also on foot, and that as she came to one of the last curves of the road, as she rounded the curve, she saw the defendant swinging a machete over and over upon Nin. She said that he did not kill him, he slashed him. That she saw the defendant swinging the machete upon her son, and that she then went to fetch Don Agapito who was coming her way and said to him: 'Félix is killing our son.' That as she returned to the place of the occurrence, which she could not reach because she did not have the courage, she saw the defendant walking away with a machete in his hand which was bloodstained. She also said that that road, the scene of the occurrence, was a public highway." (Tr. Ev., piece 1, pp. 3–4.)

The other witness, Agapito Coriano, testified that when he arrived at the scene of the occurrence the defendant was walking away with an ax and a machete in his hands.

According to the report of the autopsy, the victim received 10 wounds on the head, 6 on the upper extremity, 4 on the thorax, 7 on the back, 3 on the lower extremity, and 3 consisting of several fractures, to wit: compound fracture of the parieto-temporal bones and of the right occipital bone.

"The head—the report reads—is disfigured and presents the wounds described above. The auricular pavilion is missing (trau-

matic ablation). The external auditory ducts, the nasal fossae, and the oral cavity are full of sanguinolent secretion. The face is disfigured by the mutilative wounds. The eyeballs are normal, and the pupils and scleroticas are soft. The upper lip consists of two torn tissues. The mouth presents a fracture of the lower maxilla and destruction of many teeth by traumatic action. The neck, thorax, abdomen, extremities, and back present the wounds described." (Tr. Rec. 37.)

The accused's theory was self-defense which he sought to establish with his own testimony. After testifying on direct examination that on the day of the occurrence he was working on his farm and the victim came riding a horse belonging to the witness, as a result of which they engaged in a brief argument; and that after the victim asked him for one dollar to buy rum, he dismounted and assaulted and injured him, and he was compelled to defend himself with the machete, upon questioning by the district attorney he answered:

"Q. So, you slashed him with the machete 33 times while he assaults you with that thing that you cannot describe?
A. Of course. He swung at me. I have the machete.
Q. The thing he had was a small penknife?
A. A pick like this.
Q. What kind of pick was it?
A. About 12 inches.
Q. What kind of file was it?
A. A file.
Q. You had to slash him with the machete 33 times in order to defend yourself against that file which is a less dangerous weapon than the one you had?
A. The man goaded me.
Q. You had to slash him with the machete 33 times?
A. To get him off me.
Q. Let me see the wound which you showed to the colleague.
The Judge: Let him show it to the jury. Then let me take a look. This over here?
A. Yes, sir.

The Judge: The court sees a scar which has faded already, about two inches long.

Q. Do you mean to tell the jurors that he wounded you with that thing you now say is a file?

A. Yes, sir.

Q. Is that it?

A. He swung at me with an upward motion.

Q. Once only?

A. He swung at me about 50 times.

Q. He slashed you only once?

A. I defended myself.

Q. What did Nin do when he received the fifth blow?

A. He had it in his hands.

Q. Despite the fifth blow, Nin still had the file in his hands?

A. He is a strong man.

Q. When he received blow No. 25, he had the file in his hands?

A. He did.

Q. When he received blow No. 32, did he still have the file in his hands?

A. He did.

District Attorney: That's all." (Tr. Ev., piece 1, pp. 34–35.)

■ Defendant did not object to the instructions, and when the judge asked the parties if they wished any additional instruction, the defense attorney said: "No, sir, Your Honor covered the point we had in mind."[1]

However, we are of the opinion that the instructions were not incorrect, except for one which, because of the concurring circumstances, did not constitute an error reflecting on appellant's substantial rights and, hence, does not warrant reversal of the judgment appealed from.

■ Appellant takes isolated portions of the instructions to the jury to challenge their propriety.[2] For example, appel-

---

[1] See *People v. Pinto Medina*, 90 P.R.R. 570 (1964).

[2] Regarding this practice, see *People v. Barreto*, 85 P.R.R. 723 (1962); *People v. Cruz*, 87 P.R.R. 714 (1963); *People v. Barriera González*, 89 P.R.R. 756 (1964); and *People v. Pinto Medina, supra.*

lant challenges an instruction in which the judge advised the jury that the information is not evidence, and that its responsibility should be determined by analyzing the evidence of objects, documents, and oral evidence presented by the district attorney. He contends that no reference was made to the Government's duty to prove the accusation beyond a reasonable doubt. Another portion objected to is that in which the judge instructed that it was the jury's duty to determine carefully, on the basis of the witnesses' testimonies, whether the inculpatory circumstances from which defendant's guilt may be inferred were proved beyond a reasonable doubt. Appellant maintains that the guilt must be proved and not inferred.

After that introductory paragraph, the judge further instructed as follows:

"No general rule can be established to determine what constitutes evidence in a particular case. Each case is a rule in itself, and it should be determined in accordance with its peculiar circumstances; but all circumstances, once proved, must be consistent with each other and, taken as a whole, should point with certainty to the accused's guilt. The problem is whether the evidence, whether circumstantial, oral, or documentary, establishes defendant's guilt beyond a reasonable doubt. *If there is doubt as to such guilt, it is your duty to give defendant the benefit of the doubt and to acquit him.* I say to you that reasonable doubt is not merely possible doubt. There is reasonable doubt when after a careful examination, analysis, and comparison of the evidence, the state of mind of the jurors is such that they cannot say whether they are firmly convinced of the veracity of the facts involved in the information. This does not mean that every possible doubt should be destroyed, nor that defendant's guilt should be proved with mathematical certainty, but that the evidence should produce that moral certainty which convinces reason and satisfies the intellect. The doubt should not be speculative and imaginary. The doubt which justifies defendant's acquittal should not only be reasonable, but should flow from a calm, fair, and impartial consideration of the entire evidence in the case, or from the

lack of sufficient evidence to support the accusation." (Tr. Ev., piece 2, pp. 10–11.) (Italics ours.)

It is obvious that the two portions objected to are not erroneous. The foregoing instruction is not incomplete either because the jury was not instructed that reasonable doubt reduced the degree of the offense, since in another part of the instructions this point was clearly covered by the court, as maintained by the Solicitor General. This assignment of error is frivolous. *People* v. *Martínez Díaz*, 90 P.R.R. 456 (1964).

■ Another portion objected to is the following:

"It is your duty, rather your obligation, to presume the defendant innocent until the Government does not prove his guilt."

Although there may be an error in the use of the adverb "not," the full text of the instruction conveyed to the jury a clear and correct concept of the law on the presumption of innocence. The text reads:

"In criminal cases, gentlemen of the jury, the law presumes the defendant innocent until it is not otherwise satisfactorily proved with competent evidence. It is your duty, rather your obligation, to presume the defendant innocent until the Government does not prove his guilt with competent evidence and to the satisfaction of each and everyone of you. It is a rule of law that defendant's guilt must be fully proved. The presumption of innocence I have spoken to you about accompanies the defendant during the trial, and you must take it into consideration at the time of deliberating." (Tr. Ev., piece 1, pp. 11–12.)

■ The court instructed the jury that "in a prosecution for murder The People is not bound to offer evidence on malice."

This instruction is in fact erroneous. However, we may repeat here, because it applies to the facts in the present

case, what we said in *People* v. *Crespo Guerrero*, 90 P.R.R. 212 (1964):

"Notwithstanding that the aforesaid instruction was erroneous, we would not be inclined to reverse on that sole ground inasmuch as we consider that under the circumstances of this case no irreparable damage was caused. In the first place, the trial court had previously defined correctly the crime of murder in its two degrees, and had also spoken correctly as to the element of malice. Although the court stated that The People was not bound to prove malice, as a matter of fact The People introduced evidence concerning said element.

"Pursuant to § 200 of the Penal Code, malice may be express or implied; express, where there is manifested a deliberate intention unlawfully to take away the life of a fellow creature; and implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

The malice in this case is implied because the circumstances concurring at the time of the killing show a perverted and malignant heart. The evidence surpasses a showing of these circumstances.

■ Appellant also objects to the instruction on involuntary manslaughter. If any error was committed as to this instruction, it was its transmittal to the jury. The facts do not justify it, and in any event what it did was to favor defendant. *Cf. People* v. *Martínez*, judgment of September 25, 1964.

■ Another instruction objected to is that in which the judge said to the jury that when self-defense is alleged, there can be no participation in the struggle resulting in the killing, and, in the second place, it is necessary that the person accused be in imminent danger of death or of great bodily injury.

Appellant is of the opinion that such instruction conveyed to the mind of the jury the idea that defendant was obligated to flee until he reached the wall.

The reality is that the judge instructed the jury otherwise. Let us see his instruction:

". . . I want you to understand that the person assaulted does not have to flee. The law does not require anyone to flee. The law does not require that. The law does not require that you withdraw and escape aggression. You may remain where you are, and you have the right to defend yourself; but you have the right to defend yourself, to attack in self-defense, with those means which may be necessary in accordance with the means with which you are being attacked." (Tr. Ev., piece 2, p. 22.)

■ The trial court instructed the jury correctly in the sense that if they had any reasonable doubt as to whether or not defendant acted in self-defense, they should give him the benefit of the doubt and conclude that he acted in self-defense. *People* v. *León*, 53 P.R.R. 408 (1938).

■ Lastly, we may say that the objection is frivolous as to that portion of the instructions in which the judge said that if the jury believed that the element of deliberation is absent, but that defendant took the victim's life with premeditated intention, they were bound to bring a verdict of murder in the second degree. The judge did not invade the field reserved to the jury.

This instruction is incomplete if read isolatedly; but if we continue reading the instructions on the jury's duty and the possible verdicts which they could bring, it will be clearly seen why we have said that the objection is frivolous.

The court instructed the jury that if they believed beyond doubt that defendant had committed an . offense, but had doubt as to which offense he committed, they should find him guilty of the minor offense. He also instructed them that if they had reasonable doubt that defendant committed an offense of murder in the first degree, murder in the second degree, or voluntary manslaughter, or if they had doubt as to whether or not defendant is guilty of the

offense charged by the district attorney, it was their duty to acquit him. He also instructed them that if they believed that defendant did not commit any offense, or that he acted in legitimate defense, or if they had doubt as to whether or not defendant acted in self-defense, it was their duty to acquit him.

No erroneous instruction was therefore transmitted to the jury which reflected upon defendant's substantial rights.

The judgment appealed from will be affirmed.